UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------- x
THERAPLANT, LLC,                                                    :
                                                                    :    **MEMORANDUM &**
                Plaintiff,                                          :    **ORDER GRANTING**
                                                                    :    **DEFENDANT'S MOTION**
   -against-                                                   :    **FOR SUMMARY**
                                                                    :    **JUDGMENT AND**
NATIONAL FIRE & MARINE INSURANCE                                    :    **DENYING PLAINTIFF'S**
COMPANY,                                                            :    **MOTION FOR**
                                                                    :    **SUMMARY JUDGMENT**
                Defendant.                                          :
                                                                    :    3:22-CV-1095 (VDO)
------------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

When a fire damaged its facility, equipment, and hundreds of marijuana plants, Plaintiff Theraplant, LLC ("Theraplant") submitted several claims pursuant to its commercial insurance policy. Defendant National Fire & Marine Insurance Company ("National Fire") denied Theraplant's claim for business income loss, setting in motion the present litigation. Plaintiff brings one claim for declaratory relief under Connecticut General Statutes § 52-29 and another for breach of contract. Before the Court are cross-motions for summary judgment. Plaintiff seeks summary judgment with respect to its first claim and partial summary judgment as to its second claim. Defendant seeks summary judgment on all claims or, in the alternative, an order that would limit Theraplant's recovery.

For the reasons explained below, the Court **GRANTS** National Fire's motion for summary judgment as to both claims and **DENIES** Theraplant's motion for summary judgment.

I.  **BACKGROUND**

    A.  **Factual Background**

The following facts come from the record, including the Complaint and the parties' Local Rule 56(a) statements.[1] They are essentially undisputed.

Theraplant cultivates marijuana and produces cannabis products at a facility in Watertown, Connecticut. (Theraplant's 56(a)1 ¶ 3.) At that facility, the marijuana plants go through several stages: cloning, propagation, flowering, curing/drying, and processing. (National Fire's 56(a)1 ¶ 22.) The cloning stage lasts ten to fourteen days, and Theraplant has one cloning room. (*Id.* ¶¶ 28, 30.) The propagation stage lasts twenty-one days. (*Id.* ¶ 28.) The next stage, flowering, takes fifty-six to sixty-three days, and Theraplant boasts of seven flowering rooms in its facility. (*Id.* ¶¶ 28, 30.) If plants spend too long in one of these rooms, quality, potency, and yield can suffer. (Jugler Dep., National Fire's Ex. 6, ECF No. 67-5, 30:3–31:15.) Theraplant has tailored the lighting and irrigation system in each room to the relevant stage of cultivation. (National Fire's 56(a)1 ¶¶ 31–32.)

On February 8, 2020, a light bulb in Flowering Room 2 burst and dropped to the table below, lighting a fire. (Theraplant's 56(a)1 ¶ 11.) At the time, the room contained 998 marijuana plants that were four days into the flowering stage. (National Fire's 56(a)1 ¶ 22.) The room itself, the nearby hallway, and the plants sustained smoke damage, prompting Theraplant to dispose of all the plants in the room. (*Id.* ¶¶ 35–36, 40.) Due to ongoing repairs,

---

[1] The parties' Local Rule 56(a) statements include Theraplant's Local Rule 56(a)1 Statement of Undisputed Material Facts ("Theraplant's 56(a)1," ECF No. 55); National Fire's Local Rule 56(a)1 Statement of Undisputed Material Facts ("National Fire's 56(a)1," ECF No. 67); National Fire's Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment ("National Fire's 56(a)2," ECF No. 74); Theraplant's Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment ("Theraplant's 56(a)2," ECF No. 82).

Theraplant could not use Flowering Room 2 from February 8, 2020, to mid-April 2020. (*Id.* ¶¶ 23–24; National Fire's 56(a)2 ¶ 24.)

Theraplant's 30(b)(6) witness, Brad Jugler, did not observe a disruption to Theraplant's production in other rooms during this period. (Jugler Dep. at 46:6–12.) He testified that no room was "ever empty" following the fire. (*Id.* 29:15–21.) As soon as a room was "finished," it was "repopulated." (*Id.*) And on March 5, 2020, about a month after the fire, Theraplant's counsel sent an email to Lance Ulrick, the independent adjuster investigating the insurance claims: "[W]e'd like to get Flower Room #2 repaired and up and running as soon as possible. There are clones that will be ready to be placed in that room in five weeks." (National Fire's 56(a)1 ¶¶ 42, 46.) In a compliance report submitted after the fire, Theraplant indicated that the room was "restored to working order" on April 12, 2020. (*Id.* ¶ 48.) Theraplant transferred a new batch of marijuana plants to Flowering Room 2 on April 20, 2020. (Jugler Dep. at 39:7–10.)

At all relevant times, Theraplant's Commercial Insurance Policy (the "Policy") was in full effect. (Theraplant's 56(a)1 ¶¶ 5–6.) Issued by National Fire, the Policy included building and personal property coverage. (*Id.* ¶¶ 8–9.) The Policy explicitly excluded from the definition of Covered Property "[l]and (including land on which the property is located), water, growing crops, or lawns." (National Fire's 56(a)1 ¶ 5.) The Policy also included an endorsement that listed cannabis, marijuana, and products infused with marijuana as additional property not covered. (Theraplant's 56(a)1 ¶ 19.) Theraplant never purchased crop insurance from National Fire. (National Fire's 56(a)1 ¶ 10.)

National Fire eventually paid $483,233.56 to Theraplant for the damage to the building and $12,482.31 for the damage to Theraplant's equipment. (Theraplant's 56(a)1 ¶ 17.)

3

Theraplant does not take issue with these payments. (National Fire's 56(a)1 ¶ 44.) In light of the crop and marijuana exclusions described above, National Fire did not provide Theraplant with coverage for the lost marijuana plants. (Theraplant's 56(a)1 ¶ 19.)

In addition to building and personal property coverage, National Fire supplied Theraplant with business interruption (or "business income loss") coverage through the Policy:

> We will pay for the actual loss of Business or Rental Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by the direct physical loss of or damage to Covered Property under this policy at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

(National Fire's 56(a)1 ¶ 12.) On February 19, 2020, Mr. Ulrick, the independent adjuster, sent his first report to National Fire: he estimated that Theraplant's business income loss came to $600,000. (Theraplant's 56(a)1 ¶ 32.) He based this estimate off Theraplant's reported profit margins and gross sales per flowering room. (Ulrick Dep., National Fire's Ex. 10, ECF No. 67-8, 62:12–64:23.) On March 3, 2020, in a "Reservation of Rights" letter, National Fire acknowledged Theraplant's claim in connection with the fire, informed Theraplant that the building and some equipment were insured under the Policy, and advised Theraplant that the Policy might not cover damage to the marijuana plants. (Theraplant's 56(a)1 ¶ 34.) National Fire also stated that it would continue to investigate the claims, adding that "[i]t is our understanding there will also be a Business Income loss associated with this fire." (*Id.*) On May 15, 2020, in his fourth report to National Fire, Mr. Ulrick revised his estimate of Theraplant's business income loss to $1,200,000. (*Id.* ¶ 35.) By that point, he had received from Kinsel Forensic Accounting, National Fire's forensic accountant, a report that pegged the business income loss at approximately $1,200,000. (Ulrick Dep. at 76:2–25.)

Theraplant retained its own forensic accounting expert, Russell Zinn, for the purposes of the business income loss claim. (National Fire's 56(a)1 ¶ 61.) Mr. Zinn "derived a daily value for the damaged room" to calculate Plaintiff's lost income. (*Id.* ¶ 66.) In his analysis, he suggested that new plants would have been moved into Flowering Room 2 around April 6, 2020, were it not for the fire and ongoing repairs. (*Id.* ¶ 69.) Relying on Mr. Zinn's analysis, Theraplant submitted a business income loss claim in the amount of $1,354,593 on June 29, 2020. (Theraplant's 56(a)1 ¶ 26.)

In October 2020, National Fire sent another "Reservation of Rights" letter to Theraplant. (*Id.* ¶ 46.) This time, National Fire informed Theraplant that "the Policy may not apply to your claimed damage to your crop." (*Id.*) National Fire indicated that the business income loss "must be caused by a Covered Cause of Loss." (*Id.*) Ultimately, on July 15, 2022, National Fire denied coverage for Theraplant's business income claim. (*Id.* ¶ 38.) The insurance company explained that "[t]he claim as presented does not identify a Business Income loss during the Period of Restoration to the Building[.]" (*Id.* ¶ 40)

B.   **Procedural History**

On August 1, 2022, Theraplant commenced this action in Connecticut superior court. (Complaint, ECF No. 1-1.) On August 30, 2022, National Fire timely removed the matter to federal court. (ECF No. 1.) National Fire filed its answer, including six affirmative defenses, on September 20, 2022. (Answer, ECF No. 16.)

Following the close of discovery, Theraplant filed a motion for a pre-filing conference on February 23, 2024, indicating its intention to file a motion for summary judgment. (ECF No. 37.) That same day, National Fire filed a motion for summary judgment—because National Fire did not first request a pre-filing conference, the Court terminated the motion.

(ECF No. 39.) On March 29, 2024, the Court directed the parties to file their respective motions for summary judgment. (ECF No. 44.) Theraplant filed its motion on July 12, 2024. (ECF No. 54.) Defendant opposed the motion on August 2, 2024. (ECF No. 72.) Plaintiff filed its reply on August 16, 2024. (ECF No. 85.)

National Fire filed its cross-motion for summary judgment on July 23, 2024. (ECF No. 64.) Plaintiff opposed the motion on August 13, 2024, and Defendant filed its reply on August 24, 2024. (ECF Nos. 81, 90.)

## II.  **LEGAL STANDARD**

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[2] A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. *Id.* The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). "[W]hen

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). However, if the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof and submits "merely colorable evidence," then summary judgment is appropriate. *Celotex*, 477 U.S. at 322–23; *Anderson* 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). There must be evidence on which the jury reasonably could find for the non-moving party. *Dawson v. Cnty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004).

If there are no genuine issues of material fact, a court may decide whether insurance coverage exists on a motion for summary judgment. *Roberts v. Liberty Mut. Fire. Ins. Co.*, 264 F. Supp. 3d 394, 403 (D. Conn. 2017); *see also Constitution Reinsurance Corp. v. Stonewall Ins. Co.*, 980 F. Supp. 124, 127 (S.D.N.Y. 1997) ("Summary judgment is particularly

appropriate in resolving insurance coverage disputes, because the interpretation of an insurance policy presents a question of law.").

### III. DISCUSSION

In these cross-motions for summary judgment, Theraplant and National Fire stake out three major disagreements. First, National Fire argues that the Policy cannot cover Theraplant's business income loss because a suspension of the company's operations did not cause the loss at issue. (National Fire's Mem., ECF No. 66, at 2.) Theraplant contends that a causal link ties the suspension to the business income loss. (Theraplant's Mem., ECF No. 57, at 14.) Second, National Fire claims that Theraplant's losses were outside the "period of restoration" and therefore ineligible for coverage. (National Fire's Mem. at 2.) In response, Theraplant argues that it need not have suffered the loss during the period of restoration. (Theraplant's Mem. at 18.) Finally, National Fire argues that any liability must be limited to $166,666.67 per month. (National Fire's Mem. at 13.) In Theraplant's view, however, the Policy's upper limit is $1,000,000. (Theraplant's Mem. at 24.)

As explained below, the Court finds that Theraplant's loss did not result from a suspension of its operations. For this reason, the Policy cannot cover the loss.

#### A. Choice of Law

When a plaintiff sues in federal court and invokes diversity jurisdiction, the court "must apply the choice-of-law rules of the state in which that court sits[.]" *Liberty Synergistics, Inc. v. Microflo Ltd.*, 718 F.3d 138, 151 (2d Cir. 2013). In insurance cases, Connecticut's choice-of-law rules provide that "the law of the state with the most significant relationship to the transaction and parties ought to be applied absent a choice of law provision in the insurance contract." *Farm Family Cas. Ins. Co. v. Samperi*, 242 F. Supp. 3d 83, 87 (D. Conn. 2017)

(internal quotation marks omitted) (citing *Reichhold Chems., Inc. v. Hartford Accident & Indem. Co.*, 750 A.2d 1051, 1055 n.4 (Conn. 2000)).

Here, the Policy contains no choice-of-law provision (*see generally* Policy, ECF No. 56-11). The insured party, Theraplant, is a Connecticut limited liability company, and the fire occurred at Theraplant's facility in Watertown, Connecticut. Connecticut is therefore the state with "the most significant relationship to the transaction[.]" The parties do not appear to disagree on this front. *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) ("Implied consent is sufficient to establish choice of law." (cleaned up) (citing *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)). For these reasons, the Court will apply Connecticut law to this dispute.

### B. Policy Coverage

The Court begins with the parties' first argument. Theraplant contends that the Policy covers its business income loss claim, while National Fire argues that the business income loss did not *result from* a suspension of Theraplant's operations, as required by the Policy. (National Fire's Mem. at 4.)

Under Connecticut law, a court should interpret an insurance policy by "the same general rules" governing the construction of any written contract. *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 84 A.3d 1167, 1173 (Conn. 2014). A court should give the policy's words "their natural and ordinary meaning[.]" *Id.* The "policy language remains the touchstone of [the court's] inquiry." *Conn. Ins. Guar. Ass'n v. Fontaine*, 900 A.2d 18, 22 (Conn. 2006). A court may therefore look to the dictionary definition of a term in order to understand its "commonly approved usage[.]" *Lexington Ins. Co.*, 84 A.3d at 1175 n.8. When the contract's terms "are, without violence, susceptible of two equally reasonable

interpretations," a court should adopt the interpretation that will "sustain the claim and cover the loss[.]" *Conn. Ins. Guar. Ass'n v. Drown*, 101 A.3d 200, 215 (Conn. 2014). Any ambiguity in the policy is "resolved in favor of the insured," not the insurance company. *Lexington Ins. Co.*, 84 A.3d at 1195 (Eveleigh, J., concurring); *see also Roberts v. Liberty Mut. Fire Ins. Co.*, 264 F. Supp. 3d 394, 403 (D. Conn. 2017).

In the present case, the Court must interpret the following Policy language, the source of the parties' disagreement:

> We will pay for the actual loss of Business or Rental Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by the direct physical loss of or damage to Covered Property under this policy at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

(National Fire's 56(a)1 ¶ 12.) This provision resembles many other "business income loss" or "business interruption" provisions, which generally involve six elements. John DiMugno et al., *Catastrophe Claims: Insurance Coverage for Natural and Man-Made Disasters* § 8:4 (2024) ("We will pay the *actual loss* of Business Income that you sustain *during the 'period of restoration'* because of the *necessary suspension of your 'operations*.'"). In a coverage dispute involving such a provision, an insured party must establish (1) physical loss or damage; (2) to covered property; (3) caused by a covered peril during the policy period; (4) resulting in an actual loss of income; (5) due to necessary suspension of operations; (6) during the period of restoration. *Id.* Here, the provision at issue includes each of these six elements. The Policy requires "direct physical loss of or damage to"—the first element— Covered Property, the second element. That loss or damage "must be caused by or result from a Covered Cause of Loss," the third element. In addition, the provision requires an actual loss

10

of income, the fourth element, "due to the necessary suspension of your operations during the period of restoration," the fifth and six elements.

National Fire hangs its hat on the fifth element: it argues that the Policy requires a causal link between the actual loss of income and the necessary suspension of Theraplant's operations. (National Fire's Mem. at 4.) Indeed, the term "due to" in the Policy must be "accorded its natural and ordinary meaning[.]" *Conn. Med. Ins. Co. v. Kulikowski*, 942 A.2d 334, 338 (2008). The dictionary defines "due to" as "attributable to" or "caused by." *The American Heritage Dictionary* (2d college ed. 1982); *see South Tex. Med. Clinics, P.A. v. CNA Fin. Corp.*, No. H-06-4041 (LHR), 2008 WL 450012, at *9 (S.D. Tex. Feb. 15, 2008) (interpreting the term "due to" in a civil authority insurance provision to require a "causal relationship"). Looking to the Policy language as its pole star, the Court agrees with National Fire. Theraplant must establish that a suspension of its operations *caused* the business income loss. *See also Dictiomatic, Inc. v. U.S. Fidelity & Guar. Co.*, 958 F. Supp. 594, 603 (S.D. Fla. 1997) ("[I]f the [business income] loss was due to some reason *other than interruption*, [the insurance company] is not liable for business interruption proceeds under the insurance policy[.]" (emphasis added)).

The undisputed evidence, however, does not establish the requisite causal link. Theraplant has not put forward any evidence that it would have used Flowering Room 2 for another income-generating purpose had the repairs not been ongoing between February and April 2020. No evidence supports a finding that the room, equipped only for the flowering stage, could be used for another stage of cultivation. Nor has Theraplant put forward evidence that the ongoing repairs delayed the transfer of plants from one flowering room to another. The parties agree that a lengthy delay would have caused a drop in Theraplant's income, but

11

Theraplant can point to no evidence of a delay. And though Mr. Zinn speculated, in his forensic analysis of the loss, that plants were ready for Flowering Room 2 as early as April 6, 2020, he knew of no facts that might support that theory. (Zinn. Dep., National Fire's Ex. 5, ECF No. 76, 25:15–19.)

The evidence leads instead to the opposite conclusion: a suspension of Plaintiff's operations between February and April 2020 did not cause the business income loss. On March 5, 2020, an attorney for Theraplant sent the following email to Mr. Ulrick: "[W]e'd like to get Flower Room #2 repaired and up and running as soon as possible. There are clones that will be ready to be placed in that room in five weeks." (National Fire's 56(a)1 ¶¶ 42, 46.) This message suggests that Theraplant did not plan to use Flowering Room 2 until April 12, 2020. As to whether ongoing repairs delayed a transfer to the damaged flowering room, Mr. Jugler testified that "no disruptions" affected the other rooms in the aftermath of the fire. (Jugler Dep. at 46:11–12.) He did not know whether other plants would have gone into Flowering Room 2 between February and April 2020, had the fire not occurred in that room. (*Id.* at 46:19–47:13.) In the same vein, Mr. Ulrick based his estimates off Theraplant's gross sales and profit margin per room—his calculations reflect the financial effect of the fire, not the financial effect of suspended operations. (Ulrick Dep. at 62:21–64:11.)

Because the email suggests that plants should have entered Flowering Room 2 on April 12, 2020, the Court must address the parties' disagreement about the date of restoration. National Fire argues that the room was ready for new plants by April 12, 2020, whereas Theraplant sets that date at April 20, 2020. (Theraplant's Mem. at 14; National Fire's Opp., ECF No. 72, at 4.) If some plants were due for transfer one week before the room was ready,

that delay could have resulted in a certain business income loss.[3] However, reviewing the record in its entirety, the Court cannot infer that the room was not ready until late April. Rather, in a compliance report submitted in the aftermath of the fire, Theraplant stated that Flowering Room 2 was "officially restored to working order on 4/12/20." (National Fire's 56(a)1 at 48.) Theraplant suggests that the Connecticut Department of Consumer Protection ("DCP") only authorized Theraplant to resume its operations in Flowering Room 2 after April 12, 2020, but it has supplied the Court with no evidence to support that contention. Mr. Jugler testified that Theraplant *could* have been waiting for DCP's authorization, but he was unaware of any DCP inspection between April 12 and April 20. Theraplant offers the Court no evidence that plants languished in the wrong room for eight days.

Theraplant does not address the causation issue head on, but instead explains that it has satisfied the other elements of a business income loss claim. (Theraplant's Mem. at 12–14.) Indeed, the parties agree that Theraplant suspended its operations between February and mid-April 2020, just as they agree that the fire damaged the facility and equipment, Covered Property under the Policy. Theraplant buries its discussion of the issue in a footnote, but its discussion misses the mark. (*Id.* at 14 n.6.) In that footnote, Plaintiff reiterates that Flowering Room 2 was out of commission between February and April. Plaintiff then states that the six other flowering rooms were "100% occupied" at the time of the fire. This fact does not suggest a causal link between the suspension and the business income loss. Theraplant states that its

---

[3] Ultimately, even if Theraplant had identified a genuine issue of material fact as to this date, the Court would then turn to National Fire's response: a delay of this length has little effect on yield, quality, and potency. (National Fire's Opp. at 5.) Indeed, Theraplant has put forward no evidence that a delay affected the marijuana plants in this way. (National Fire's 56(a)1 ¶ 54.) The parties agree on this front.

operations were "nonexistent for a period of time, as a result of which it sustained a loss of income due to damage" to the room and equipment therein. Again, Theraplant fails to explain *how* the suspension itself caused the business income loss. Plaintiff simply assumes the existence of a causal relationship, but the Court cannot do the same.

Theraplant also argues that the Policy must cover its business income loss because the fire, a covered cause of loss, was also the efficient cause of loss. (Theraplant's Mem. at 17.) After all, under the "train of events test," "the active efficient cause that sets in motion a train of events which brings about a result without intervention of any force started and working actively from a new and independent source is the proximate cause." *Frontis v. Milwaukee Ins. Co.*, 242 A.2d 749, 753 (Conn. 1968) (cleaned up). If two concurrent causes precede a loss, "the efficient cause—the one that sets the other in motion—is the cause to which the loss is to be attributed[.]" *Id.* The doctrine is inapplicable to the present dispute, which does not involve the confluence of multiple but-for causes. *See, e.g., Farrell v. Royal Ins. Co, of Am.*, 989 F. Supp. 159, 161, 165 (D. Conn. 1997) (applying the "train of events" test to determine whether the Policy covered the loss when negligence, a covered cause, and pollution, an excluded cause, both triggered the plaintiffs' loss). Plaintiff has not established that both the fire and the suspension caused the business income loss. In fact, the very issue in the case is whether Theraplant's loss *resulted from* the suspension of its operations.

Nor is the Court persuaded that Mr. Zinn "demonstrated the significant effect on operations and damage Theraplant sustained as a result of the unavailability of Flowering Room 2." (Theraplant's Reply, ECF No. 85, at 3.) Using historic average yields, he assigned a "daily production value" to Flowering Room 2. (Zinn Dep. at 33:18–34:19.) He simply calculated the cost to Theraplant of the discarded marijuana plants. (*Id*. at 31:13–20 ("Q: Okay.

14

It says, 'In order to measure the lost revenue, we have calculated the sales value of lost production.' What does that phrase mean, 'sales value of lost production'? A: That is the normal selling price of production that was lost – production that was destroyed.").) Nothing in his methodology suggests that Theraplant would have put Flowering Room 2 to use between February and April 2020.

The Court knows of no analogous case, but it reaches its conclusion by applying principles of contract interpretation. As a general proposition, "the purpose of business interruption insurance is to indemnify the insured against losses arising from an inability to continue normal business operations and functions due to damage sustained as a result of the hazard insured against." *United Air Lines, Inc. v. Ins. Co. of Pa.*, 439 F.3d 128, 131 (2d Cir. 2006). Business interruption insurance does not exist to help the insured recover for damaged or destroyed property. *See Nw. States Portland Cement Co. v. Hartford Fire Ins. Co*., 360 F.2d 531, 533 (8th Cir. 1966) ("[T]he [business interruption] policies are not fire insurance policies that provide for the reimbursement for specific property destroyed by fire."); *see also Polytech, Inc. v. Affiliated FM Ins. Co.*, 21 F.3d 271, 275 (8th Cir. 1994) (discussing the differences between business interruption insurance and personal property insurance). Thus, to give effect to the parties' intent in entering this contract, the Court must interpret the Policy without losing sight of the purpose of business interruption insurance. *Misiti, LLC v. Travelers Prop. Cas. Co. of Am.*, 61 A.3d 485, 490–91 (Conn. 2013) ("A contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy giving the words of the policy their natural and ordinary meaning[.]").

A comparison proves instructive. In *Woodbine Group, Inc. v. Citizens Insurance Co. of America*, a fire damaged one of two elevators in a hotel, prompting the plaintiff—the hotel's

owner and operator—to submit a business income loss claim under a similar policy provision. No. 14-CV-680 (BKS), 2016 WL 7742778, at *3 (N.D.N.Y. Apr. 8, 2016). Since the other elevator was also out of order, the plaintiff had to suspend normal hotel operations on four floors. *Id*. In its motion for summary judgment, the insurance company argued that the plaintiff failed to cooperate during the investigation process—the defendant did not (and could not, in this Court's view) argue that the hotel failed to satisfy the elements of a business income loss claim. *Id*. at *9. In contrast, the present case involves a business that lost almost a thousand marijuana plants in a fire. Theraplant indisputably suspended operations in Flowering Room 2 for several weeks, just as the hotel suspended its operations on four floors, but Theraplant has not established that the suspension *resulted* in the loss. Ongoing repairs did not force Theraplant to scale back its business. To allow Plaintiff to recover here would neither further nor serve the purpose of business interruption insurance.

  The Court need not wade into the parties' disagreement about the Policy exclusions. In support of its motion for summary judgment, National Fire contends that the Policy "unambiguously excludes" marijuana. (National Fire's Mem. at 3.) Defendant points to the Policy's definition of Covered Property, as well as an additional endorsement, expressly excluding marijuana from coverage. (*Id.*) In its own motion, Theraplant contends that these exclusions modify the Building and Personal Property Coverage form, not the Business Income Loss form. (Theraplant's Mem. at 15.) Because the Court's conclusion flows from the language of the Policy itself, it need not decide whether the endorsement modifies the Building and Personal Property Coverage form or the Business Income Loss form.

  Ultimately, Plaintiff attempts to recover for the loss of 998 marijuana plants. Theraplant did not purchase crop insurance, so it tries to mold the claim into a business income loss.

Theraplant fails, however, to form a causal link between its loss and the suspension of its operations from February to April 2020. Because the Court finds that the Business Income Loss form does not cover the loss at issue, it does not reach (1) National Fire's argument that Theraplant's losses were outside the "period of restoration" and therefore ineligible for coverage (National Fire's Mem. at 2) or (2) National Fire's contention that any liability must be limited to $166,666.67 per month (National Fire's Mem. at 13).

## IV. CONCLUSION

For the foregoing reasons, the Court **grants** National Fire's motion for summary judgment (ECF No. 64) and **denies** Theraplant's motion for summary judgment (ECF No. 54). Judgment is entered in National Fire's favor. The Clerk is respectfully directed to close this case.

**SO ORDERED.**

Hartford, Connecticut
January 18, 2025

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge